My apologies for the delay, Your Honor. No apology necessary. And I apologize for my voice. Not at all. May it please the Court, I'm Scott Stewart on behalf of the United States. If I may, Judge Fletcher, I'd like to aim to save five minutes for rebuttal. Okay. Thank you. In this case, the District Court issued an extraordinary nationwide injunction halting a critical executive branch rule designed to prioritize urgent asylum claims, deter meritless ones, combat human smuggling, protect vulnerable migrants, and find a lasting diplomatic solution to the shared international problems presented by unconstrained mass migration. This Court stayed that injunction in part and the Supreme Court stayed it in full. This Court should now vacate the injunction in its entirety. I'd like to begin, Your Honors, where our briefs do and where the lead issues are in this case with the statutory authority issue. As we've explained in our briefs, the department heads, the Attorney General and the Secretary of Homeland Security have square authority to issue additional conditions and limitations on the granting of asylum. Okay. And the statutory sections upon which you rely are? Sure, Your Honor. 8 U.S.C. 1158, B-1 and B-2C in particular, but overall, Section 1158 does... Okay, let me just read to you. Of course, you know it, but B-2C, the Attorney General may by regulation establish additional limitations and conditions consistent with this section under which an alien shall be ineligible for asylum under Paragraph 1. And there's sort of an odd parallel later. Attorney General may provide by regulation for any other conditions or limitation on the consideration of application not inconsistent with this chapter. Those are the statutory authorizations that you've got. Right, Your Honor. Is there anything here in the language that I've just read to you that suggests that the limitations or conditions imposed by the Attorney General under these sections have to be in some fashion similar to the conditions or exceptions already existing in the statute? No, Your Honor. Why not? That is to say, as I look, for example, at B-2C, it says conditions for granting asylum, and then there are quite a few exceptions that are put in here. And then C is a subsection. I don't know why eustem generis does not apply. Well, I'd add another provision, Your Honor. I should have emphasized this as well. I mentioned the B-1 provision. This is B-1A, where it establishes or makes clear the discretionary nature of asylum. It's kind of the baseline. It's a benefit to which no one is entitled. It's a discretionary matter. But, yeah, but that's a different proposition. May grant asylum assuming eligibility. I mean, we've got this very odd procedure, actually, under which the BIA and then if it comes to us, we determine eligibility, and after that the Attorney General in his or her discretion determines whether to grant. That's what I regard B-1A as addressing, that discretion. I think there's discretion. There's some discretion at each part, Your Honor. But we're addressing here eligibility and not the exercise of discretion at the end. I mean, it is an outset, a question of eligibility, and then later there can be at the end a further discretionary. But we're addressing the eligibility question. Correct, Your Honor. Right. This rule does get to eligibility. And what I'd emphasize, though, Judge Fletcher, is that we start from the place where asylum is a discretionary benefit to which somebody is not entitled. We have a situation... Well, it's discretionary, except there are all kinds of things in the statute. But the discretion, Your Honor, I mean, even what those discretionary or what those bars, I should say, they point out the circumstances in which the executive branch can't deny asylum. And it gives... The statute then gives the agency heads additional square authority to establish additional situations where asylum is not available for someone. Do you think the Attorney General could adopt a rule precluding eligibility for anyone who had been present in the United States for more than a week before making an application? The deadline would be... So basically, like... I mean, you know, the statute has the one-year bar, but in my hypothetical, the Attorney General, by regulation, is going to say if you've been here more than a week, you're not eligible? I think it's... I put it this way, Your Honor. I mean, there could be... There could be... I don't see how that would be squarely inconsistent with something in the statute. The statute does say you have to file within one year, but that's not a square preclusion of tightening that bar. Saying, like, hey, asylum applicants could now apply within 18 months, that could potentially raise a conflict, but tightening the timeline wouldn't. It could... You know, there could potentially be other non-statutory claims available in that case, Your Honor, but I can't at least at this point think of how that would be inconsistent with something in the statute. I mean, isn't it at least in considerable tension with the way we approach the statute in... I don't know what to call it. It was also East Bay, but the December 2018 motions panel order on the Port of Entry rule that, I mean, the hypothetical I'm imagining, I mean, the Attorney General would be imposing a regulation that essentially makes one of the limitations in the statute, you know, completely pointless, which we condemned in East Bay, too. I think we have a different situation there, Judge Miller. We have a circumstance where, again, the government respectfully disagrees with the state panel ruling, of course, but where the state panel believed that Section 1158A1's provision of giving somebody a right to apply for asylum, whether or not they applied at a Port of Entry, was basically rendered a dead letter or meaningless by denying that to folks who, in that circumstance, were going to be rendered ineligible based on their unlawful entry. I think it's we don't have that sort of square. Certainly, even if the hypothetical Your Honor is positing regarding timeline were a closer case or something more like that, this one is not such a case. We don't have that kind of situation here. Here, there's nothing in the asylum provisions that says you can't, you, Attorney General or Secretary, cannot establish an additional bar based on the possibility of, based on actions in a third country or a relationship to a third country or things that might happen in a third country. If anything, those provisions show that this bar is complementary and consistent and promotes similar purposes. It gets at folks who, just like in the firm resettlement bar and safe third country bar, don't need this country's protection or are unsuitable for it. The firm resettlement provision is a good example, Your Honor. The logic behind the firm resettlement bar is, of course, that look, if somebody has gotten such a secure situation in a third country that they're firmly resettled, then they categorically don't need to access our asylum system. So too here. It's a similar logic. Somebody who, you know, can seek, you know, has failed to even seek asylum has not shown that they have the urgency needed, potentially bears on the merit of their claim and is supportive of a kind of categorical judgment of the sort the agency's issued here. I'm having trouble following you when you say that the policy at issue here is like the firm resettlement or safe third country policy that's written specifically into the statute. What the government has done here seems to me in severe tension with both of those things. First, as to firm resettlement, there's obviously no firm resettlement. Firm resettlement, as I think you quite correctly said, is based upon a premise that the person or people are safe, they're firmly resettled, and they have no need for asylum here in this country. Similarly, with a safe third country, that's very specific in its detail. It requires first off an international agreement, bilateral or otherwise, and it requires various procedures. We've got nothing here. In fact, the evidence is fairly strong that the people who are barred by the administration's policy are in fact quite unsafe where they are. They are not firmly resettled. How do you respond to that? Sure, Your Honor. With respect to the firm resettlement bar, what I'd say is the firm resettlement bar reflects a judgment that this group definitely does not warrant asylum. Nothing in it bars another rule, considering whether an alien's relationship with or actions in a third country through which they transited could also warrant a categorical bar. The firm resettlement bar does not include language to be effective, and in no other circumstances involving prior presence in a third country will somebody be eligible. So this involves a tighter restriction that addresses another group or a group that is likewise, because they haven't even demonstrated the urgency of their claim, have shown that they too are... When you say they haven't demonstrated the urgency of their claim, what do you mean? These are people who have come to our border. They're seeking asylum. They are not safe in Mexico. There's no evidence at all that they're safe in Mexico. There's quite a bit of evidence to the contrary. When you say they've not demonstrated the urgency of their claim, what do you mean? We disagree with that determination, Your Honor. What determination? The safety issue. As we've said, the agency heads were permitted to determine that Mexico has a functioning asylum system, that it has capacity, and that it is signatory to the relevant agreements and can address these claims. Now, that's not... You just changed gears. We were talking about safety, and you didn't mention safety. I was addressing the safety piece, Your Honor. The point I'm making is I don't take that as given. What you said did not address safety. You talked about various procedures. Right, Your Honor, but there's nothing in the statute that requires those additional procedures. With respect to the aspect of Your Honor's question regarding urgency, as my friends recognize, some aliens pass through multiple countries, and if it's true, the agency heads surely could reasonably conclude, as they did, Your Honor, that the failure to seek relief in even a single one of those countries sheds light, at least in many cases, on the urgency of their claims and that it presents such a systemic, broad problem that it does warrant a categorical rule to prioritize the most urgent ones, those who have really been trying to seek relief at the earliest opportunity, and deprioritize others who have not sought relief and gotten a decision on that. Why doesn't it speak just as much to the question of whether they're going to be safe in that country they're passing through? I mean, the safe third country provision has a procedure for entering into an agreement with that country and the attorney general determining that in that country they'd have access to a full and fair procedure and so on and so forth, none of which is represented in the current provision that says if you pass through a third country, you can't apply here. My answer there, Judge Clifton, is that, again, the failure even to seek a result, to seek relief in a third country, in any third country, that somebody transits is itself probative. Of what? Of the lack of urgency and potentially the lack of merit to a claim. And so I started by saying, why isn't it just as probative potentially as to whether that third country would provide a safe place? What I'd say there is, Your Honor, is that to the extent that's a different viewing and weighing of the evidence, of the facts, and of the experience-laden, foreign policy-laden determinations here. And the agency heads here are well positioned to say, look, on a significantly large scale, what this shows is that people in many cases who are coming to claim asylum at our borders and gain years-long release into our country do not have urgent claims. They haven't showed that their claims are urgent. They're not even trying to get relief in other countries. And that's, the agency heads are well positioned to say, that's a problem and it's something that we should address on a categorical rule. So it's a question of weighing the relevant evidence and making the relevant determinations. What evidence? It sounds very theoretical. And I understand the theory. I mean, the idea is that once they've gotten out of, pick your country, Honduras, then they should be satisfied getting someplace that's not Honduras. But that doesn't say one way or the other whether the place they are, let's assume it's Mexico, has an asylum system that is open to them, has a place that they can be safe while they're being processed. To the extent that the rationale for this rule is we've got this huge backlog, shoving it off to another country doesn't mean there's going to be a resolution to the claim any sooner. The safe third-country provision sets standards, findings that a determination has to be made before you redirect somebody to a third country. I don't see any of that reflected in evidence or anything else in what's been put in front of us here. But, Your Honor, there's nothing in the statute that requires those similar procedures to apply in this context. The safe third-country context can apply in a situation to sending somebody to a country they've never been to before. And Congress embraced procedures there that, again, made it very clear that somebody would be fine being sent to that country. But here the agencies can also say, look, we have this discretionary benefit. We're leaving untouched withholding of removal, cap protection, those things that address non-refinement issues. And we're leaving those untouched, but given the strain on our system and given what we, the agencies, see as these systemic problems about people claiming relief but not having urgent claims, this is how we'll address it. I see you have five minutes, Your Honor. All right. No, please go ahead. So, I mean, but I guess the question I have is the APA gives you a lot of discretion in weighing the costs and benefits here, but you do have to acknowledge, or the agency has to acknowledge what it's weighing. And the argument from the other side is that your rule, in imposing a categorical rule, you're assuming that people with meritorious claims should have presented them in Mexico, and they're saying that that's not a reasonable assumption here because of the problems that people face in applying in Mexico. And so the question is where did the agency grapple with that criticism of the rule and where did you address the concern that Mexico really isn't a safe place for people to apply? The main spots are 33, 839 to 840 of the rule, Your Honor. And I would quibble a little, Judge Miller. I would suggest that it's not that the failure to apply categorically shows a meritlessness to the claim. The agency acknowledges that the rule will channel some claims with merit potentially to other countries, but it's a question of failure to apply anywhere raises questions about validity, urgency, and given this overwhelming strain that we as a country are facing of migration, this is a reasonable and congressionally authorized tool to try to share the burdens, allocate those more equitably, and find a more lasting solution to what is a very, very challenging situation. As to Mexico itself, the carryover paragraph on 33, 839 to 840 is where I note some of the key points about Mexico being a party to relevant agreements, as are other countries, Mexico expanding its capacity. The record also shows that this kind of foreign affairs engagement has increased Mexico's efforts to combat human trafficking and deal with these shared migration challenges. So those are some of the key points that show that this is that sort of an effort. Too many numbers. What's 33, 839? Oh, this is the rule itself, Your Honor. Okay. Yeah. With that, I'll try to save the remaining time for a moment. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, legal alert from the ACLU for plaintiffs. I want to begin with the question that Judge Miller asked the government because I think that forces the government to join issue on the statutory question, and then I want to turn to both the statutory question and the arbitrary and capricious points that the government was making in response to Judge Clifton's questions. There are two ways to understand this statute because the statute, as Judge Fletcher pointed out, has very explicitly said that any additional limitations or conditions must be consistent with the whole of Section 1158. One way is the way we interpret it to be that whatever the government does, whatever additional limitations or conditions, has to be consistent with what Congress was getting at in the statute. The government has taken the opposite position and said any restriction they want to put in is consistent with the statute because the statute doesn't guarantee anybody the right to apply for asylum. So I think Judge Miller's question was the right one. What about a deadline, moving the deadline from one year to one week? Obviously, when you set a deadline, Congress has competing goals. They don't want someone walking in 10 years from now and saying, I want to apply for asylum. But on the other hand, they recognize that one week is too difficult for someone who's fled a country and is traumatized. And the implications of the government's position are this. They could move the deadline from one year to one week. It says in Eligibility Bar, serious political, nonpolitical crimes. They could take out the word serious and just say any nonpolitical crime. It says particularly serious crimes. People who are ineligible for asylum, they could take out the words particularly serious and just crimes. They could have a moratorium on asylum for five years. So the implications of the government's position cannot be Congress could not essentially say we're going to allow the Attorney General to eliminate asylum. And I want to be clear about it. This rule effectively eliminates asylum, except for wealthy people who have the ability to fly here. Everyone enters through a land port when they're seeking asylum. Can I just tell you the difficulty, I think, with that reading of the statute is that there are these various exceptions that you've just talked about,  and so I'm wondering if your position doesn't amount to saying that even though the Attorney General has very broad discretion, just as may grant, in exercising that discretion, are you saying that he can't take into account factors that are already addressed? Right. So I appreciate that question. Is there a field preemptive effect of those? I apologize for interrupting. I'm sorry. No, I appreciate that question. And I think that goes to one of the issues that Judge Bybee looked at in the first asylum ban case, which is that you can often look at a factor as one of many as a discretionary factor, even if you can't make it a catechal bar to eligibility. And that's the exact argument that Judge Bybee rejected in the first East Bay case. There are a lot of times when you can give it some weight, but the BIA and this court have said you can't give it dispositive weight. And so I think the implications of saying the government, the Attorney General can do whatever he wants as long as it's more restrictive, really couldn't make sense. It literally could eliminate the asylum statute. And the government says, well, we can give meaning to consistent with. We can't do anything that expands the rights of people to apply for asylum, expand eligibility. Well, that's not a tenable reading of the statute, because it says additional limitations and conditions. Adding, making the deadline 18 months wouldn't be an additional limitation or condition. So Congress had to mean consistent with, meaning restrictive conditions. It couldn't be that Congress is saying to the Attorney General, eliminate asylum if you want. And I think, you know, that goes to a larger point that Judge Bybee made in the first asylum ban case, that this is ultimately a separation of powers case. I mean, the government says we're figuring out how to deal with the current influx of asylum seekers. And Judge Bybee said, but that's classic administrative law. You need to go to Congress. You can't go around what Congress said. Well, classic separation of powers, but classic just statutory interpretation. Exactly. And the government relies upon the, it says it relies more broadly on A, but I think it really is relying on those two sections that authorize the government to, for example, Attorney General may write regulation establishing additional limitations and conditions consistent with this section. As we're trying to figure out what Congress meant by these two sections, authorizing the Attorney General to do this, this is a statute that is implementing our treaty obligation. Our treaty obligation is to provide asylum broadly. Why should I interpret or we should interpret this so broadly as the government when the whole statute is designed to implement our treaty obligation? Well, I think that's right, Your Honor, that that's one of the things you should consider in addition to the normal tools of statutory construction is, is it consistent with our treaty obligations because in 1980, Congress was trying to implement our treaty obligations. I think the fullest explanation of that is in one of the amicus briefs by the UNHCR, which is tasked with implementing these treaty obligations and the refugee obligations and interpreting them. I think that's an absolutely additional reason. I think once you get to the point where you say the Attorney General cannot do whatever he wants, it has to be consistent with the aims of Congress, then you go to where Judge Clifton was and look at, well, what provisions illuminate what Congress was trying to do when someone passed through a third party, sorry, passed through a third country, and you look at the two provisions in there. One is firm resettlement, and it's specifically, and this Court has said it, you need to be permanently resettled so you're safe. The other is the third country agreement, and that sets up a process where the other country is going to formally agree to take these people. It has to provide a safe haven, and there has to be a fair and full asylum process. You look at the rule. It doesn't take anything into account. And so what's implicit in this rule, imagine if it was explicit, because I think it would not change the meaning of it, but it would make everything clearer. The rule says if you transit through a third country and don't apply, then you can't seek asylum in the U.S. Imagine if it explicitly said what's implicit and said, even if your claim could not be heard in that country because it's not a claim like an LGBT claim that's recognized in one of those countries. Imagine if it said, even if you're not going to be safe there. Imagine if it said, even if your persecutors are going to trail you there. So the rule doesn't take anything into account. And then I think it goes to the larger question about arbitrary and capricious. There is absolutely no evidence that this is prioritizing meritorious claims. I think the pages that the government cited to you, Judge Miller and Judge Clifton, you look at those and you'll see nothing about the safety in Mexico. The government was absolutely required. We don't want to sit here and testify. The amicus briefs give you a good sense of what's going on in those countries, but it has to be within the administrative record. It also has to take into account what's been said about these issues before. This court in Demese said it is not a basis for assuming anything about why someone would have transited through a country. It simply foreclosed. That is not a reasonable assumption. As Judge Clifton said, an equally probative and on the record before, in the administrative record, it's absolutely what the proper assumption is, that it's just too dangerous for people to wait. Those asylum systems don't function. Maybe the administration could come with a better record, and we don't think so given the amicus briefs and what we know about it, but it doesn't really matter. It's ultimately what's in the four corners of the administrative record. I think, as Judge Miller pointed out, there's really overwhelming evidence that the reason people don't apply in other countries is because it's too dangerous. Again, if you look at the whole record and you look at specifically the pages the government cited, you'll find nothing that justifies the assumption that people don't have an urgent claim to apply in one of those countries. Unless there's questions about that, I would turn briefly to the notice and comment claim. We believe, like in the first East Bay case, Asylum Ban 1, that the government needed to have notice and comment, and they have not justified the lack of notice and comment with good cause or foreign effect. I think it's basically the same case as East Bay 1. What I would note is that in that first case, Judge Bybee said, look, what you have here is not sufficient to justify avoiding notice and comment. The government did not put in additional evidence to justify it. They did not put in expert studies. They did not show prior examples. What they've put in is a few additional newspaper articles. Essentially, if a few newspaper articles that don't even specifically address the issue here about surge were enough to have good cause, it would. The harder problem under notice and comment is the foreign affairs exception. Would you address that? Yes, Your Honor. So I would start with this court's decision in Yesenia, which said that you have to have definitely undesirable consequences flowing from it. And what I think Yesenia and the cases point out is if you have something that's a classic function, a foreign affairs function, a diplomatic regulation, something along those lines, that the government may be entitled to more deference that that's going to interfere with foreign affairs. But something, as Judge Bybee pointed out, like immigration, which implicates foreign affairs in the same way that lots of things do, but simply implicates it but is not a classic foreign affairs function, you could drive a truck through the exception if you said every time there's immigration you would have an exception to notice and comment. And I think so it's the government's obligation, and Judge Bybee explained that in the first case, to show why there actually would be definitely undesirable consequences. The government, unlike in Yesenia, did not put in affidavits. They could have even put in in-camera affidavits. I think what the government is basically saying to you is, look, we're in negotiations, so conceivably it could harm foreign affairs. That cannot be. But we're in negotiations, and this rule might help us in those negotiations. I think, Your Honor, anything could conceivably help, and I think that's what they're saying to you. And because there's always negotiations. But I want to make one point that I think is actually dispositive that Judge Bybee made. The question is not really whether there's going to be a rule. It's whether the publication of the rule versus the announcement of the rule is going to cause those problems. And I think what Judge Bybee pointed out is announcing the rule versus publication of the rule is not really going to change how the foreign affairs plays out. And so I think that's really the critical point that Judge Bybee made is, look, you can announce the rule, you can publish the rule, either way the other country knows what's going on. It's not really going to affect it one way or the other. I think the government's obligation was to do something in response to what Judge Bybee pointed out, and they put in no evidence to suggest there's actually a foreign affairs problem here. Unless the Court has further questions about the notice and comment, what I would just say is we urge the Court to read the record and see how little evidence, in fact, zero evidence showing that people don't apply because they don't have an urgent claim. The final point I wanted to make is regarding kids, because I think that got short shrift in the briefs. That's an additional reason why we believe the rule is arbitrary and capricious. The government says, well, Congress hasn't precluded us from applying this rule to kids. Well, even assuming that were true, the government still has an obligation to just say, why are we going to do this? Why are we going to apply it to kids? When Congress exempted from the third country agreement provision, exempted from the one-year deadline, kids, because they knew that kids have a more difficult time figuring things out. They knew that maybe one year is not enough for kids to figure out how to apply for asylum. They knew that sending them to another country, they may not be able to figure it out. And so the government says, well, Congress allowed us to do it. Again, we dispute that. But even so, on the arbitrary and capricious point, they really would have had to have a reason to say, we are going to send kids to another country. We are going to force them to try and navigate the system in Mexico, which, by the way, has a 30-day deadline for applying for asylum. So a child who's traumatized, running for his life from Honduras or El Salvador, gets to Mexico. If they can't figure out in 30 days how to apply for asylum, then that's it. So the government was really obligated to say, why does this make sense from a policy reason, from an arbitrary and capricious standpoint. And finally, Your Honor, I just want to make one point about the nationwide injunction, because I know that the government may raise that on rebuttal. And I want to just pick up on the discussion you were having with the lawyers from the prior case. We are not asking, we know that there are Ninth Circuit cases that say in the immigration area there should be a presumption that the injunction is going to apply nationwide, and that flows also to some extent from the APA rules. We are not asking for that to be the basis for a nationwide injunction. We are saying that on the facts found by Judge Tiger, our plaintiffs would be harmed without a nationwide injunction, even if it was a circuit-wide or a client-based, because our clients operate around the country. They do more than just direct representation. So we are simply saying that on the facts in this case, it's warranted. What is your interest in an injunction that applies to asylum seekers who are not clients of you or the organizations you represent? Your Honor, that's a very good question. I think what the evidence shows in the affidavit is unrebutted, and what Judge Tiger found is that a good portion of what our clients do is provide trainings and workshops for people who are not actual clients. Unfortunately— And I saw that, but I was, I've got to say, unpersuaded by that, given that Ninth Circuit immigration law is not necessarily the same as Eighth or Tenth or any other circuit. And so if you're training people to deal with immigration cases arising in Texas, you're going to have to deal with a different body of case law, aren't they? They are, Your Honor. So what's the harm in recognizing that different circuits have different precedents? But I think, Your Honor, that we do more than just simply represent people directly. So if there's a training and the training then has to be—we would not be able to do that type of thing. If you're training people in Texas, I hope that training recognizes that the Fifth Circuit's precedent is what's going to bind those cases. It does, Your Honor, but the injunction then wouldn't run to them. So they would be denied asylum automatically because they are saying the only people who would get the benefit of the injunction are the actual retained clients. Somebody's raised that issue in the Fifth Circuit. So I'm mystified as to why Ninth Circuit rules. I mean, it should, of course. We should rule everything, but the Supreme Court hasn't recognized that yet. Your Honor, so let me—I realize that maybe I'm not being as clear as possible. Our clients represent people all over the country. So it's not as if we're only representing people in the Ninth Circuit. Do you have any idea of numbers or proportion or anything? A significant number of people. And so Law Lab, for example, one of the plaintiffs, has offices all around the country and does a significant, significant amount of trainings, workshops all over the country. The other problem is they don't know ex ante who is going to ultimately be a retained client. So they do trainings, for example, all over. They don't know at that point who is going to be a retained client. So if only retained clients are getting the benefit of the injunction, then they would have to constantly be telling people both ways. And if you end up being a client of ours—I think the other thing that Judge Tiger pointed out is it would make these four organizations the most popular organizations in the country. Every single person would say, well, we're going to be denied asylum unless you decide to retain us. It would also make—but even without that, the Ninth Circuit becomes popular. Enter in California or Arizona, don't enter in New Mexico or Texas. But isn't that the fact of life already? And yet people do what they have to do. I think that's true to some extent. I would just note that the government is not actually asking for the circuit-wide injunction. They feel like the only injunction that works is retained clients. And I think for the reasons Judge Bybee said, that Judge Tiger said below in the affidavits, something that only applies to retained clients would knock out most of the work that these organizations are doing about training. If you're talking about precedent, if we speak as a panel on a published opinion, that's going to apply within the boundaries of the Ninth Circuit. What I'm not hearing is a reason why it should apply in New Mexico. Well, I think because, Your Honor, our trainings would not make sense in New Mexico or wherever in the country if the injunction didn't apply to those in New Mexico. But that's a ticket to a nationwide injunction in every case. You don't need to certify a class anymore. You just need an organization that says, we want to tell people what the law is, and it's easier to do that if the law is the same everywhere. That's true, Judge Maynard. That's a fair point, except what I think is the limiting principle is there's not really that many organizations that actually have this nationwide scope. So there are very detailed affidavits in the record that Judge Tiger The ACLU Immigration Rights Project probably is as national as can be. Why doesn't it become the plaintiff in every case so it can nationalize every single decision that you get from the Ninth Circuit? And we're not actually a plaintiff in this case, I think, for the very reason that we don't do direct services and we don't do this kind of work. So we would never have put in an affidavit saying that we are harmed. We would just be harmed by the litigation, and that's not a proper basis. But these organizations are now fighting all over the country to represent people and do more than direct representation. So why should they be able to take a favorable decision and they get someplace and make that binding on everybody else? Your Honor, I think you're going to the percolation point, and I appreciate that. I want to address that. I think the percolation point is a fair point, but I don't think it actually stops other lawsuits. So there's one going on in D.C., and ultimately all the lawsuits will keep going. Maybe they'll end up in the court, maybe they won't. But I think percolation will continue. I've got to tell you, my fear is that you'll get exactly what we got here, which is the Supreme Court saying we're not going to let one district judge someplace make a rule, and so we wind up with a stay that doesn't even let that court speak to its own territory. And the nationwide injunction is a two-edged sword, not just chronologically. I mean, everything we're hearing today, eight years ago we heard from the other side. It's a serious problem. And just telling me that, well, it's going to make it harder for my clients, other parts of the country, kind of a thin soup. No, Your Honor, that's all fair, and I hear what you're saying. And so I would just close by saying that we don't think there's a categorical rule. Barring nationwide injunction, we are simply saying on these facts, and I think it would be your assessment based on the affidavits in here and the lack of rebuttal by the government and Judge Tiger's findings, whether we would get full relief here, unless there's further questions. Thank you, Your Honors. Thank you. You've saved some time. Thank you, Your Honor. A few points I want to make sure to hit. As a starting point, I think one of the fundamental problems on the statutory authority piece, and I want to make sure to hit hopefully the nationwide injunction point as well as briefly the notice and comment point, is that the plaintiff's theory here and the district court's approach is that the safe third country provision and the firm resettlement bar have a kind of field preemptive effect where they deal with the situations where an alien has an action in or a relationship with a third country, and those are the only circumstances in which asylum eligibility rules can speak to third country actions or relationships. That's inconsistent with Section 1158B2C. It's inconsistent with the structure of the statute. Well, maybe it is, maybe it isn't, because both of those two sections require that the regulations restrictions be consistent with the statute, and it may not be a tight Euston Generous principle, but it may be that the regulations have to be broadly consistent with the thrust of the rest of the statute. I mean, I think, again, starting from the discretionary nature of asylum, the ability to sweepingly deny it, Your Honor, I think that that comes at the problem a little bit maybe backwards is the right descriptor there. Asylum is a discretionary benefit, and there are areas where it just cannot be granted at all. Wait a minute. It is discretionary in some senses, but we have a statute that speaks to many aspects of it, and in that sense not discretionary at all. But it's never required to be granted in any case, and one other point I want to emphasize, Your Honor. Well, wait a minute. It is never required to be granted in any case only because after eligibility for asylum has been determined, it is in the discretion of the attorney general whether actually to grant it. It is not entirely discretionary as to whether someone is determined to be eligible for asylum. Again, there's broad discretion in enacting regulations that address that matter, Judge Fletcher. That's the question. How broad is the discretion? And here, for the reasons we've explained, this rule is consistent with those provisions. The other points I want to make sure of. Why is it consistent? I understand that it's not directly contradicted, but why is it consistent? Because it's consistent with the aim and thrust of those other two bars, which get at the proposition. And how do you characterize the aim and thrust of those other two? As I said before, Your Honor, the firm resettlement bar, the logic of it, and the safe third country provision, where somebody has such a good circumstance or such a strong venue, place to live, that they categorically do not need asylum from this country. There you go. Okay, so I take that as an accurate description. And why is the administration's policy that's here challenged consistent with that? Because what we have is evidence of they have not applied, and I think for good reason, asylum in Guatemala. They've not applied for asylum, I think for good reason, in Mexico. They're safe in neither place. Those are decisions for the agency heads, Your Honor, based on the record before, and they made a different determination. Please don't interrupt. Those are decisions by the administration to make, but it's got to be record-based. And I see very little evidence in the record in front of the administration that says that Guatemala is a safe country. The record here focuses more on Mexico, Your Honor. But the rule applies to Guatemala as well, doesn't it? It does, but aliens will transit in Mexico, and it requires applying in only one of those countries. And the face of the rule explains Mexico, why Mexico will. Well, it doesn't actually. I mean, I looked at the pages you cited. Those are the pages I remember looking at before that noted that Mexico had an asylum system and had a certain number, I think maybe up to 50,000 applications in a year and so forth. I didn't see anything there that spoke to safety. But safety, Your Honor, that's not the primary point of the rule. It's a question of— That's the primary point of asylum. Again, but it's—Your Honor, the refoulement issues are addressed through withholding— You still haven't learned how to pronounce that word. I'm sorry, Your Honor? You mispronounced it the last time you were here. It's refoulement. I don't know how to pronounce it either. Judge Fletcher, as you know, you've seen me before. I stand strong on everything, and I'm going to stand strong on non-refoulement. If I may address just two quick points, Judge Fletcher, I realize I'm over time. Quickly, on notice and comment, I think you had it right, Judge Fletcher, when you pointed out that this rule, the immediate effectiveness of this rule, is a tool that helps ongoing negotiations, gives us leverage, forces our foreign partners to confront the challenges of migration. It falls within the foreign affairs exception for that reason and for the other reasons we've given. With respect, finally, to the nationwide injunction point, I think Your Honor did very well to capture a number of the problems with the universal injunction, stifling percolation, making things an emergency where the Supreme Court, unfortunately, has to step in on a number of cases. They don't really have to, but they've elected to, so here we are. At times we ask them to, Your Honor. Indeed. Indeed. And I would say here, Your Honor, that my two main responses— with respect to my friend—is that these workshops and so forth, there's no cognizable interest for these organizations to have a particular workshop model or particular trainings. And that all goes to why any injunction, if at all, should go to bona fide clients of these organizations. They have not—my friends have not identified a single bona fide client in this case. Well, frankly, I'm willing to accept that they exist because at least one of the organizations has offices scattered around at least several states. I remember Missouri was on the list someplace and so forth. So I'll accept as a given they have actual clients who would be affected potentially as to whether an injunction in this case applied where they were. Why is that not enough? It's their obligation to demonstrate with evidence that a particular person would be affected, Your Honor. And I think the reason—the likely reason that they didn't come forward and do that is that as soon as you start coming forward with clients, it makes quite clear that they could bring individuals before the court and show the extent of any cognizable harm by demonstrating that with, hey, these are our retained clients. They declined to do that, and that's enough to cancel the injunction in this case. Can I just ask one last statutory question? This is a rulemaking, but you haven't asserted Chevron. Can you address why you think Chevron deference is inapplicable here? Sure, Your Honor. I think the way I'd put it is that this case, it's almost like the maximum of an agency's rulemaking authority because there's a square statutory provision saying that the agency heads can adopt additional regulatory bars on top of statutory ones. It's not an implied delegation. It's not just—it's an explicit grant of rulemaking authority, which gives kind of—recognizes, I'd say, maximal discretion to adopt those bars. That seems like a reason that you would have a strong argument for Chevron deference, but you haven't made the argument at all. Right. I mean, I think—our answer is I think that the statute is quite clear on that, Your Honor, and that at step one of Chevron, we do have—it's clear that we can adopt this kind of a bar, that nothing in the statute prohibits this kind of a bar, and that this is consistent with our discretionary authority. So are you asking us to apply Chevron? I mean, I think the way I'd frame it, Your Honor, is that you don't get to an ambiguity phase or a step two phase or anything like that. It's just we're right on the statute at step one, and that solves the issue, and I think that's what I'd— I think I heard the answer is you're not relying on Chevron deference? We don't need deference to prevail in this case, Your Honor. I didn't ask—that's not quite what I asked. I said are you saying you're not relying on Chevron deference? We have not invoked that so far, Your Honor. Okay. It sounds like you'd take it if that's the way you could get to the result you wanted. I think we'd take it for a victory, Your Honor. Again, I don't think the court needs to go down that road.  Thank you, Your Honor. Thank you. I thank both sides for helpful arguments. East Bay Sanctuary Covenant v. Bar submitted for decision. And that concludes our proceedings for this morning. All rise.
judges: W. Fletcher, Clifton, Miller